IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11-cr- 494 (CMH) |
| | ) | |
| MOHAMAD ANAS HAITHAM SOUEID | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

Were this matter to go to trial, the United States of America would prove the following

facts beyond a reasonable doubt:

1.     From in or about March 2011, and continuing thereafter up to and including on or

about October 5, 2011, within the Eastern District of Virginia, and elsewhere, the defendant,

MOHAMAD ANAS HAITHAM SOUEID, did unlawfully and knowingly, and without prior

notification to the Attorney General of the United States as required by law, act in the United

States as an agent of a foreign government, to wit, the Government of Syria ("GOS") in violation

of Title 18, United States Code, Section 951.

2.     The current phase of civil unrest in the Middle East began in January 2011, and

this period of unrest is commonly referred to as the "Arab Spring." Unrest began unfolding in

Syria in mid-March 2011. The defendant began his work within the United States as an agent of

the GOS in March 2011, as well. The defendant regularly communicated with an official in the

GOS ("Syrian Official"), who is a member of the *Mukhabarat*, a term used to describe the

intelligence agencies within the GOS. The purpose of the defendant's work on behalf of the

GOS was to collect information, including audio and video recordings, of Syrian dissident

activity within the United States and Syria, and then to pass that information to officials in the GOS.

3.      Beginning in the middle of March 2011, the Syrian Official and the defendant developed a plan to video record and audio record protest rallies, and other activities, conducted by individuals within the United States protesting the GOS and to pass that information to the GOS. The plan also entailed making separate recordings of individual Syrian-Americans and Syrians who were protesting the GOS within the United States and Syria. In furtherance of these plans, the defendant recruited individuals living in the United States to make these recordings, as well as to collect other personal information on the Syrian dissident community. After the protest rallies or individual protestors were recorded, the defendant delivered *via* email the recordings and information to the Syrian Official. During the course of the commission of this offense, the defendant regularly maintained contact with the Syrian Official by way of email and telephone communications. The collection of information and recordings concerning the Syrian dissident activity occurred primarily in Washington, D.C., and in the metropolitan D.C. area. The defendant regularly sent information to the Syrian Official and GOS about this dissident activity by email and telephone from the Eastern District of Virginia.

4.      At no time during the commission of this offense did the defendant notify the Attorney General of the United States, or any other designated official of the Department of Justice, that he was acting in the United States as an agent of the GOS as he was required to do by law, nor did the defendant publicly acknowledge in any way that he was acting as an agent of the GOS.

5.      Between April 17, 2011 and June 12, 2011, the defendant delivered *via* his email

2

accounts at least 23 audio recordings of Syrian protestors to the Syrian Official. During this same time period, the defendant delivered *via* his email accounts to the Syrian Official at least nine video recordings of groups protesting the GOS.

6.     The defendant also regularly communicated other information on Syrian dissident activity in the United States and Syria to the Syrian Official *via* email and telephone. For example, on or about April 19, 2011, the defendant emailed a coded message describing a meeting of protestors in the United States that was held in Alexandria, Virginia. Attached to the email was a link listing who was missing and dead in the April demonstrations in Syria against the Syrian government. The defendant also emailed to the Syrian Official the contact information, including phone numbers and email addresses, for protestors in the United States.

7.     The defendant also communicated to others about infiltrating the Syrian dissident community. For example, on April 6, 2011, the defendant delivered an email with information that he had infiltrated a dissident group in the United States. In the email discussing a particular Syrian dissident, the defendant claimed, "we're in his ring now."

8.     On April 17, 2011, the defendant delivered an email containing "product codes" to the Syrian Official. These codes were abbreviations for names of individuals, locations and other things in the United States. The defendant and Syrian Official also developed a coded system for referring to the Federal Bureau of Investigation ("FBI"). The defendant and the Syrian Official relied upon these codes to pass information and to discuss topics related to the Syrian dissident activity in the United States and Syria

9.     The use of product codes is one method the defendant, the Syrian Official, and others used to conceal their activities. Among other concealment efforts, the defendant and the

Syrian Official relied upon multiple email addresses to communicate with one another. In fact, the Syrian Official maintained a separate email account specifically to receive reporting on and recordings of protestors from the defendant.

10.   On or about April 30, 2011, the defendant sent the Syrian Official an email titled "what we talked about" in the subject header, attaching a handwritten letter from the defendant to the Syrian Official. In the letter, the defendant wrote, among other things, "disposing of dissension is a must and should be decisive and prompt." (Underscore in original.)

11.   On or about June 23, 2011, the defendant departed for Syria. On the day of his departure, the defendant spoke with the Syrian ambassador to the Untied States and they exchanged personal contact information. While in Syria, the defendant met with the Syrian Official and other Syrian government officials. The defendant also met with Syrian President Bashar al-Assad, both in a group setting and privately. During the private meeting, the defendant discussed dissident activity in the United States with President al-Assad. The defendant was later presented with an expensive Hablut watch by someone associated with President al-Assad.

12.   The defendant returned from Syria, arriving at Dulles International Airport, on or about July 6, 2011. The defendant falsely told a Customs and Border Protection officer upon his re-entry to the United States that his purpose for traveling to Syria was to visit his father.

13.   The defendant departed for Syria with one laptop computer, which contained recordings of anti-Syrian government protests and protestors in the United States, yet returned to the United States with two laptop computers, one of which had an Arabic language keyboard. The second laptop was provided by the *Mukhabarat*. Because of the defendant's prolonged

detention at the airport upon his return from Syria, the defendant told the Syrian Official he was going to destroy the laptops. The defendant subsequently destroyed both laptops.

14.     On or about July 7, 2011, the defendant spoke with the Syrian Official in code. The defendant told the Syrian Official that he changed procedures due to being searched and questioned at Dulles when he returned from Syria. The defendant also stated that the search and questioning would not stop the project.

15.     On or about July 10, 2011, the defendant asked the Syrian Official to send him one thousand dollars.

16.     On or about July 16, 2011, the Syrian Official and a Brigadier General met with the defendant's father in Syria. The defendant spoke with the Brigadier General on the telephone as he was meeting with his father.

17.     On or about July 26, 2011, the defendant spoke with a person living in the United States about postponing a trip by Syrians living in the United States to Syria to show their support for the GOS. The defendant gave the person permission to call the Syrian Official about the postponement of the Syria trip.

18.     On or about July 30, 2011, a second person living in the United States told the defendant that he photographed and videotaped a clash between pro-GOS and anti-GOS demonstrators. The defendant asked the person for the raw footage of the videos.

19.     On August 3, 2011, Special Agents with the FBI questioned the defendant outside of his home in Leesburg, Virginia. During the 55 minute interview, the defendant made numerous materially false statements. Among the false statements, the defendant falsely stated "no" and "absolutely not" when asked:

      i.      Are you aware on any individual specifically [who] is either taking photographs or videotaping people?

      ii.     Have you ever directed anyone to audio or videotape any conversation, meeting, rally, or protest?

      iii.    Have you ever collected any information on United States persons, people living here in the United States, and transmitted that ... information to a foreign government, maybe to Syria?

      iv.    Have you ever been an agent of the Syrian government?

      v.     Are you a foreign intelligence officer?

20.    On August 3, 2011, after FBI Agents departed his home, the defendant destroyed documents in his backyard.

21.    On or about October 3, 2011, the defendant obtained a Syrian passport at the Syrian embassy with an alternate spelling of his name. Between April 2011 and October 2011, the defendant regularly visited the embassy of Syria located in Washington, D.C. The defendant received preferential treatment when he visited the Syrian embassy.

22.    The acts taken by the defendant, MOHAMAD ANAS HAITHAM SOUEID, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all the persons with whom the defendant may have engaged in various illegal activities. The defendant further acknowledges that he is

obligated under this plea agreement to provide additional information beyond that which is described in the Statement of Facts.

23.     The Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against the defendant regardless of whether the plea agreement is presented to or accepted by a court.  Moreover, the defendant waives any rights that the defendant may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____

Dennis M. Fitzpatrick
W. Neil Hammerstrom, Jr.
Assistant United States Attorneys

By: _____

Brandon L. Van Grack
Trial Attorney
National Security Division
U.S. Department of Justice

Defendant's Signature: After consulting with my attorneys and pursuant to the plea agreement entered into this day between the defendant, MOHAMAD ANAS HAITHAM SOUEID, and the United States, I hereby stipulate that the above Statement of Facts is true and

accurate, and that had the matter proceeded to trial, the United States would have proved the

same beyond a reasonable doubt.

_____
Mohamad Anas Haitham Soueid
Defendant


**Defense Counsel's Signature:** We are MOHAMAD ANAS HAITHAM SOUEID's

attorneys.  We have carefully reviewed the above Statement of Facts with him.  To our

knowledge, his decision to stipulate to these facts is informed and voluntary.

_____
Michael S. Nachmanoff
Todd M. Richman
Counsel for the Defendant

8